FILED

AUG 25 2014

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**ORDERED PUBLISHED**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP No.   NV-13-1196-KiTaJu |
| ) | |
| WAYNE A. SEARE and MARINETTE ) TEDOCO, ) | Bk. No.   2:12-bk-12173-MKN |
| ) | Adv. No.  2:12-ap-01108-MKN |
| Debtors.          ) | |
| _____) | |
| ) | |
| ANTHONY J. DeLUCA,              ) | |
| ) | |
| Appellant,       ) | |
| ) | |
| v.                             ) | **O P I N I O N** |
| ) | |
| WAYNE A. SEARE,                ) | |
| ) | |
| Appellee.        ) | |
| _____) | |

Argued and Submitted on January 24, 2014,
at Las Vegas, Nevada

Filed - August 25, 2014

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Bruce A. Markell, Bankruptcy Judge, Presiding

Appearances:   Christopher Burke, Esq. argued for appellant,
Anthony J. DeLuca; Appellee Wayne A. Seare argued
pro se.

Before:  KIRSCHER, TAYLOR and JURY, Bankruptcy Judges.

Opinion by Judge Kirscher
Concurrence by Judge Jury

KIRSCHER, Bankruptcy Judge:

Appellant Anthony J. DeLuca ("DeLuca") was the bankruptcy attorney for chapter 7[1] debtors Wayne A. Seare ("Seare") and his wife Marinette Tedoco ("Tedoco") (collectively, "Debtors"). DeLuca appeals an order from the bankruptcy court sanctioning him for conduct related to his handling of Debtors' case. We AFFIRM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**A. Prepetition events**

**1. The district court lawsuit and judgment against Seare**

In December 2010, Seare sued his former employer St. Rose Dominican Health Foundation ("St. Rose") for employment discrimination, alleging that he had been the victim of sexual harassment by a female co-worker and that he was wrongfully terminated in retaliation for his reporting the harassment. The co-worker's harassment of Seare allegedly included sending him sexually explicit emails. After an investigation of the matter by St. Rose, Seare was terminated.

While the lawsuit was pending in the United States District Court for the District of Nevada ("district court"), Seare admitted to his attorney that he had "embellished" the explicit emails to bolster his harassment claims. Seare's attorney disclosed the misconduct to the district court in a motion to withdraw. Ultimately, on October 24, 2011, the district court ordered sanctions against Seare, dismissed his lawsuit against

---

[1] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

St. Rose with prejudice, and ordered him to pay St. Rose's attorney's fees ("Sanctions Order"). The district court found that Seare had committed "fraud upon the court" by knowingly providing false information, allowing his attorney to file an amended complaint based upon that false information and instituting and conducting litigation in bad faith.

A judgment was entered on October 25, 2011, in favor of St. Rose for its attorney's fees of $67,430.58 ("Judgment"). The one-page Judgment did not mention "fraud" or provide any factual or legal bases for supporting the Judgment. Thereafter, St. Rose obtained a Writ of Garnishment and served it on Seare's current employer. The garnishment of Seare's wages prompted Debtors to seek counsel about whether to file bankruptcy.

**2. Debtors retain bankruptcy attorney DeLuca**

Some of the facts surrounding Debtors' meeting with DeLuca are disputed, but other facts are not. DeLuca contends that certain facts asserted by Tedoco and relied upon by the bankruptcy court were not admissible, which we address below.

Debtors consulted with DeLuca, a bankruptcy attorney of eleven years, at his office on February 13, 2012, at around 5:00 p.m. This meeting was Debtors' only in-person contact with DeLuca, but DeLuca testified that he spoke with them at least once by phone thereafter.

During an evidentiary hearing, Seare testified that Debtors gave DeLuca a copy of the "order" and the Writ of Garnishment and that DeLuca "thumbed through them." Seare had also asserted in a pre-hearing brief that Debtors gave DeLuca two documents at their initial consultation — a copy of the Order for Wage Garnishment

-3-

and the Sanctions Order. Tedoco also asserted that Debtors gave DeLuca copies of the Order for Wage Garnishment and the "Wage Sanctions." DeLuca had no independent recollection of meeting Debtors or of reviewing the Sanctions Order or Judgment. He did, however, concede that his firm knew about the Judgment and Order for Wage Garnishment at the time the bankruptcy petition was filed.

Debtors claimed DeLuca reviewed the district court papers and told them that the debt referred to in the Order for Wage Garnishment and Judgment was dischargeable. Seare claimed in a pre-hearing brief that during the consultation, Tedoco told DeLuca that the St. Rose debt and Order for Wage Garnishment were not from medical expenses. Rather, the debt was based on the Sanctions Order for attorney's fees, which was imposed because Seare submitted embellished emails to the district court in his lawsuit against St. Rose. Seare also testified that he told DeLuca about his embellished emails. According to Seare, DeLuca affirmatively told Debtors that the St. Rose debt referenced in the Order for Wage Garnishment was dischargeable, even though it was incurred through fraud. However, Seare contradicted himself when he testified that "fraud" was never discussed during the consultation. Seare testified that DeLuca did not discuss with Debtors about what sort of debts might not be dischargeable or that an adversary proceeding might be filed against him.

After the brief consultation with DeLuca, Debtors were placed in a room to read, initial and sign the 19-page retainer agreement ("Retainer Agreement") under which they hired DeLuca. Tedoco claimed that DeLuca's staff periodically checked to see if they

-4-

had completed the documents, but that no one sat with them to explain any part of the Retainer Agreement. DeLuca testified that standard protocol in his office required a paralegal to sit with a client and explain every paragraph of the retainer agreement to make sure the client understood it. However, he did not know and had no record of which paralegal met with Debtors because he did not keep such records.

Debtors executed the Retainer Agreement, initialing every paragraph and signing every page, and paid DeLuca a $200 down payment.[2] At the bottom of each page (right above Debtors' signatures) is the statement: "I have read, understand, and agree to this page and its contents." On the last page (right above Debtors' signatures) is the statement: "I have read and received the foregoing NINETEEN (19) pages and I understand and agree to its terms and conditions." In addition, DeLuca provided Debtors with a 19-page document entitled "Frequently Asked Questions" ("FAQ"). DeLuca did not sign the Retainer Agreement, which is evidently the same agreement signed by all clients, with only a few differences in fees depending on whether the case is filed under chapter 7 or 13. His stamped signature is, however, on the first page of the Retainer Agreement, which is a form letter thanking clients for their business. This letter also states that while "some advisories (in the retainer agreement) may not appear to apply to you at this time, we do need you to sign that you understand or that you agree that you have been advised on each

---

[2] DeLuca's flat fee to file a chapter 7 case was $1,999, which included the $306 filing fee and the credit report fee of $35.

topic."

The Retainer Agreement separates basic services from those services requiring additional fees. For matters beyond the "basic services," DeLuca's billing rate was $495.00 per hour (or perhaps $395.00, as the relevant paragraph refers to both figures). The Retainer Agreement provides:

BASIC SERVICES: Services to be performed by DeLuca & Associates include:

a. Analysis of debtor's financial situation and assistance in determining whether to file a petition under . . . Chapter 7 or chapter 13. . . .
b. Review, preparation and filing of the petition, schedules, statement of affairs, and other documents required by the bankruptcy court;
c. Representation at the meeting of creditors.
d. Reasonable in person and telephonic consultation with the client . . . .

ADDITIONAL FEES: There are circumstances which may require additional fees.

Additional attorney fees will be charged for additional services including but not limited to: [1] Addressing allegations of fraud or non-dischargeability; . . . [13] . . . Adversary Proceedings . . . .

For the additional fees, the Retainer Agreement does not explain the relationship between items [1] and [13].

The Retainer Agreement also includes a "fraud" disclaimer: "DEBTS THAT DO NOT GO AWAY: Non-dischargeable debts (debts that you must re-pay), or debts not affected by client's bankruptcy, include but are not limited to the following: debts incurred through fraud . . . ." Seare testified that he signed the Retainer Agreement despite reviewing and understanding the fraud disclaimer because DeLuca had told him that the St. Rose debt was dischargeable. The FAQ also explains that debts incurred through fraud are nondischargeable. Seare said that he did not read the

-6-

FAQ because Debtors had already asked DeLuca questions during the consultation. Seare testified that based on the Retainer Agreement, he understood that DeLuca would not be representing him against allegations of fraud. Seare also testified that adversary proceedings were not discussed at the consultation and at that time he did not know what an adversary proceeding was.

The Retainer Agreement also includes a request for copies of "ALL LAWSUITS you have been involved in within the last two (2) years . . . ." DeLuca claimed Debtors never provided sufficient documentation relating to the district court lawsuit as required.

Finally, the Retainer Agreement explains the length of DeLuca's representation of a client: "I understand that following the discharge of my bankruptcy DeLuca & Associates' representation is concluded by operation of law. I understand that DeLuca & Associates is no longer obligated to represent me in any capacity with regard to my bankruptcy filing after the discharge order is entered. I understand that any work requested following discharge of the bankruptcy will be an additional fee."

**B. Postpetition events**

**1. The bankruptcy case is filed.**

DeLuca filed Debtors' chapter 7 bankruptcy petition on February 29, 2012. The St. Rose debt was listed as a "garnishment" on Schedule F in the amount of $67,431.00. The Judgment underlying the St. Rose debt was listed in Debtors' Statement of Financial Affairs and indicated that the nature of the proceeding was a "collection." The Disclosure of Compensation of Attorney for Debtors stated that Debtors agreed to exclude "representation . . . in any dischargeability actions" or "any

-7-

other adversary proceedings" from the flat fee.

At the § 341(a) meeting of creditors on March 30, 2012, St. Rose informed Debtors and counsel that it intended to enforce its rights under the Judgment through a nondischargeability action.

**2.    The adversary proceeding is filed.**

St. Rose filed an adversary complaint against Seare, seeking to except its debt from discharge under § 523(a)(4) and (a)(6). The summons and complaint were served on Seare on or about June 5, 2012. DeLuca apparently received electronic notice of the complaint the day it was filed.

Debtors received a discharge on May 30, 2012. Approximately $137,430 in unsecured debt was discharged, or 62% of Debtors' unsecured, nonpriority claims.

On June 4, 2012, DeLuca sent Debtors an email informing them of their discharge and that, as of the discharge date, their case was completed. The email is a "form" message and did not mention any particulars of Debtors' case or the recently-filed adversary proceeding by St. Rose. It stated, "[W]e are very happy to inform you that you can now move forward with a fresh start on life, free from the stress of excessive debt. Now you can place your financial situation back on the right track."

Debtors replied to the June 4 email later that day, thanking DeLuca for his help with their bankruptcy and inquiring whether the St. Rose "Judgement [sic] Order" had been discharged, since St. Rose had indicated at the § 341(a) meeting that it was pursuing the adversary proceeding against them. They closed the email by asking DeLuca to "[p]lease let us know what we need to

do."

DeLuca's office responded to Debtors' email on June 5, 2012. The response reminded Debtors of St. Rose's expressed intent at the § 341(a) meeting to pursue legal action for the Judgment. The response also stated that on April 16, 2012, about six weeks prior to the filing of the adversary complaint, DeLuca received from counsel for St. Rose a "fax cover letter . . . with an attached Stipulation and Order regarding the discharge-ability [sic] of subject debt in question as to Mr. Sear [sic] only," and that his office had promptly responded to the letter advising counsel that DeLuca "would not sign off on any Stipulation regarding the discharge-ability [sic] of any debt listed in the schedules." DeLuca never consulted with Seare before rejecting the proposed stipulation and order. It is unknown whether DeLuca informed St. Rose that he was not representing Seare in the adversary proceeding. The response went on to explain that DeLuca had performed all of the duties for which he was contracted, and that he would not be representing Seare in the St. Rose adversary proceeding. DeLuca's office referred Seare to another attorney.

Debtors replied to the June 5 email on June 6, 2012. They admitted that DeLuca was hired only to "do our bankruptcy," but were very upset and frustrated that the proposed stipulation and order were never sent to them or that DeLuca's office, "at the very least," had not made them aware it. Debtors requested copies of the referenced documents between St. Rose and DeLuca's office. In closing, Debtors stated: "Not informing your clients of very important documents and failing to return phone calls are unacceptable and unprofessional customer service."

On June 6, 2012, DeLuca personally sent a letter to Debtors informing them that he would not be representing them in the adversary proceeding and referring them to another attorney. Seare later claimed that he and Tedoco found it disturbing that DeLuca advertises a "full service" bankruptcy firm, yet he was requesting that Debtors hire another attorney. Seare testified that he tried to retain other law firms to represent him; one declined, one said they did not handle such matters and another said it would be very expensive.

In his pro se answer to the St. Rose complaint, Seare argued that the debt was dischargeable "due to hardship on the dependents of debtor." Seare admitted to having embellished the emails in the district court case, but stated that other evidence existed to support his position. Seare alternatively requested that the debt be "modified" to a feasible payment plan. Notably, Seare complained that his district court attorney had "thrown [him] under the bus" when he informed the court of Seare's manufacturing of the emails and that this same attorney had also "failed to forward settlement information" regarding St. Rose.

On August 2, 2012, the bankruptcy court held a scheduling conference. DeLuca did not appear for Seare. Seare told the court that DeLuca had told Debtors that he did not represent clients in adversary proceedings. Counsel for St. Rose stated that he had informed DeLuca shortly after Debtors filed their petition of his client's intent to file a nondischargeability action.

**3.    The court issues the order to show cause.**

On August 3, 2012, the bankruptcy court issued its "Order to

-10-

Show Cause Why This Court Should Not Sanction Anthony J. DeLuca for Failing to Represent Debtor in the . . . Adversary Proceeding" ("OSC"). The court was concerned that DeLuca had violated certain provisions of the Nevada Rules of Professional Conduct ("NRPC"), specifically, NRPC 1.2(c), NRPC 1.1 and NRPC 1.5.

DeLuca was ordered to show his compliance with NRPC 1.2(c), particularly, whether not representing Seare in the adversary proceeding was reasonable and whether he had obtained Debtors' informed consent for such limitation. DeLuca also had to produce a copy of his June 6 letter to Debtors. The OSC provided that if the court found DeLuca had violated any of these rules, it could: (1) impose monetary sanctions, including requiring DeLuca to pay for Debtors' representation in the adversary proceeding; (2) impose nonmonetary sanctions, such as requiring DeLuca to represent Debtors; (3) order disgorgement of his fees; or (4) refer the matter to the Nevada State Bar.

In response to the OSC, DeLuca explained that Debtors had mentioned a judgment from "medical debts" during the consultation, but they failed to mention the significant detail that the debt was ordered by the district court as a result of Seare's manufacturing of evidence, lying to his attorney and then allowing his attorney to submit an amended complaint containing false information to the court. Had these details about the fraudulent nature of the debt, of which Debtors were well aware at the time of the consultation, been brought to DeLuca's attention, DeLuca claimed he would have declined to represent them, citing to his "Tell the Truth" section of his retainer agreements. In short, DeLuca contended that he undertook the representation of Debtors

-11-

based on incomplete, inaccurate or intentionally omitted information regarding the fraudulent nature of a significant portion of their debts. DeLuca argued that he was entitled to accept representation of debtors based on full disclosure, particularly when it related to substantive issues such as a large debt incurred as a result of manufacturing evidence and committing fraud upon the court.

DeLuca also noted that his retainer agreements specifically exclude adversary proceedings as part of the services he provides for the basic fee. Further, his office had immediately advised Debtors via the June 5 email and his June 6 letter that he would not be representing Seare in the adversary proceeding and that they should seek alternative counsel. Attached to DeLuca's response were portions of an unsigned retainer agreement, copies of the emails between his office and Debtors and a copy of his June 6 letter.

### a. The initial OSC hearing

The bankruptcy court held an initial hearing on the OSC on September 13, 2012. DeLuca, Seare and Tedoco appeared. The court noted that DeLuca's brief did not substantively address the specific provisions of the NRPC raised in the OSC, namely, whether DeLuca obtained informed consent from Debtors to limit his representation and whether limiting his representation was reasonable under these circumstances. In response, DeLuca said that the Retainer Agreement excluded adversary proceedings and that it was reasonable to not represent debtors because they were not forthcoming about the fraudulent nature of the St. Rose debt, saying only that it was a debt to a hospital. DeLuca further

-12-

argued that it was reasonable for any competent attorney to assume that a debt to a hospital was for medical services, which are dischargeable, and not a debt relating to fraud for manufacturing evidence and that it would be reasonable for a client to tell the attorney about it. DeLuca conceded that he knew the Judgment existed, but contended that it would be incumbent upon the client to inform the attorney about the details of it. DeLuca also conceded that had he reviewed the Sanctions Order and Judgment, it would have been obvious the St. Rose debt was based on fraud.

Based on DeLuca's responses, the bankruptcy court expressed concern that he may have also violated two sections of the Code: §§ 707(b)(4) and 526(a). For that reason, the court ordered additional briefing and set an evidentiary hearing, during which either party could call witnesses. DeLuca offered to return Debtors' fee, but the court found this offer potentially insufficient as Debtors were now embroiled in a nondischargeability action and the court questioned the benefit of their discharge.

On September 20, 2012, the bankruptcy court entered an order setting the evidentiary hearing and confirming its instructions that DeLuca be prepared to address his compliance with the aforementioned provisions of the NRPC, as well as his compliance with §§ 707(b)(4)(C) and 526(a)(1)-(3).

### b. The OSC evidentiary hearing

In response to the bankruptcy court's concern about his compliance with NRPC 1.2(c) and NRPC 1.5, DeLuca contended in his supplemental brief that Debtors had consented to the limited scope of representation and that limiting his representation was

-13-

reasonable under the circumstances. To show Debtors' consent, DeLuca argued that Debtors had signed the pages of the Retainer Agreement where it explained the scope of services covered under "Basic Services" and "Additional Fees." Debtors had also signed the last page, which stated they had read the Retainer Agreement and agreed to its terms and conditions. DeLuca contended that Debtors were clearly advised of what services would be covered under the $1,999 flat fee and what services would require additional fees because it was his office's protocol for a paralegal to review a retainer agreement line by line with each client. Debtors had also initialed the paragraph and signed the corresponding page setting forth the Length of Representation, which stated that DeLuca was no longer obligated to represent them after entry of the discharge order.

As for reasonability, DeLuca made several arguments. First, Debtors had indicated they could not afford to pay DeLuca the additional fees for litigation services. Therefore, argued DeLuca, he was not required to work without compensation, citing the Thirteenth Amendment. DeLuca next argued that it was reasonable and within his discretion to not represent Seare because Seare had a history of lying to his own attorneys and manipulating them into pursuing judicial claims. DeLuca asserted that once he learned of the full breadth of Seare's unscrupulous conduct, he determined that representing Seare was a liability to him and his firm, so he did not wish to represent him.

Next, DeLuca argued that the adversary proceeding was legally indefensible because Seare had committed fraud, so representing him in litigation would have been futile. However, DeLuca claimed

-14-

that after the initial OSC hearing, he did try to procure a settlement with St. Rose on Seare's behalf. According to DeLuca, St. Rose was receptive and willing to reduce its claim to $23,000, with a nominal down payment and monthly payments of $300.00.[3] DeLuca advised Debtors of the offer, but they wished to pursue their own settlement directly with St. Rose. Lastly, DeLuca argued that Seare was not prejudiced by the nonrepresentation because DeLuca had advised him immediately after the adversary complaint had been filed that he was unable to represent him. Thus, Seare had months to find substitute counsel, yet he chose to represent himself.

As for his compliance with § 707(b)(4)(C), DeLuca argued that he performed due diligence in light of the limited information Debtors provided and their urgency to file bankruptcy to stop the garnishment. Despite the Retainer Agreement's request for all documentation from lawsuits within the last two years, DeLuca contended that Debtors provided only copies of a letter from St. Rose indicating its intent to file a notice of name change and the Writ of Execution, which indicated the amount of the Judgment but did not disclose the nature of the award. In any event, argued DeLuca, Seare knew he had committed fraud and the Retainer Agreement expressly stated that debts incurred by fraud "do not go away." The FAQ given to Debtors provided the same information. Therefore, argued DeLuca, Seare was fully aware prior to filing that debts incurred through fraud were nondischargeable. DeLuca

---

[3] The bankruptcy court admonished DeLuca for attempting to disclose settlement terms on the record. However, it did allow him to question Seare about it on a limited basis and Seare testified that the settlement offer amount was less than $67,000.

-15-

disavowed ever telling Debtors that fraud debts were dischargeable.

Lastly, DeLuca argued that even though the St. Rose debt was nondischargeable, Debtors benefitted immensely from the bankruptcy filing. Their total unsecured debt was approximately $220,000, and they eliminated about $137,000 of it, excluding the $67,000 Judgment and $15,000 in student loans. Further, Seare's credit score had increased by over 100 points since the filing, which Seare even conceded was a benefit. Thus, argued DeLuca, the benefits clearly exceeded the $1,999 they paid. Moreover, the filing temporarily stopped the garnishment; Debtors now had an opportunity to settle with St. Rose. DeLuca did not address the court's concern regarding his potential violation of § 526(a).

The OSC evidentiary hearing was held on October 23, 2012. Seare and DeLuca testified. The bankruptcy court admitted all of DeLuca's exhibits and announced that the matter would be deemed submitted once the transcripts from the two OSC hearings were placed on the record. The OSC hearing transcripts were filed on October 30, 2012. Tedoco filed a "Supplemental Hearing Brief" on December 4, 2012, requesting that the bankruptcy court "make it part of the record." It provided most of the same information already testified to by Seare, namely, what was said or not said about the St. Rose debt at the consultation. The only new and potentially relevant information it provided was that when making calls to DeLuca's office asking to speak to him personally, Debtors were continually passed off to other staff members, who also would not return their calls without Debtors leaving multiple messages. Tedoco also claimed again that no staff member ever sat

-16-

down with them to review the specifics of the Retainer Agreement.

**4.    The opinion and order for sanctions**

The bankruptcy court issued its opinion and order sanctioning DeLuca on April 9, 2013 ("Sanctions Opinion").[4]  Dignity Health v. Seare (In re Seare), 493 B.R. 158 (Bankr. D. Nev. 2013).  The court held that DeLuca had violated ethical rules NRPC 1.1, 1.2, 1.5, and 1.4. and certain sections of the Code — §§ 526(a)(1) and (3), 528(a)(1) and (2), and 707(b)(4)(C).

**a.    The bankruptcy court's findings and conclusions**

To the bankruptcy court, this case presented the legal issue of when consumer bankruptcy attorneys may limit the scope of their representation, a practice referred to as "unbundling."  In re Seare, 493 B.R. at 176.  While acknowledging that unbundling is permissible in Nevada, and that an attorney can charge additional fees for adversary proceedings, the court noted that it had to be

---

[4] After entry of the Sanctions Opinion, the bankruptcy court granted DeLuca's requests to temporarily stay, until determined by this Panel, publication of the Sanctions Opinion and the requirement that for the next two years DeLuca provide a copy of the Sanctions Opinion to future adversary clients whose case he declines.  We address the latter issue later in this Memorandum.

As to the first issue, DeLuca disputes the bankruptcy court's decision to publish the Sanctions Opinion, contending that it impermissibly went beyond its own list of what potential sanctions DeLuca faced.  DeLuca argues that due to his lack of a prior disciplinary record and the court's finding that he did not act knowingly, and because he tried to represent Seare in a settlement, publication of the Sanctions Opinion is too severe. He requests that we make the stay permanent or, at minimum, that his name be deleted from the Sanctions Opinion, citing In re Martinez, 393 B.R. 27, 30 n.1 (Bankr. D. Nev. 2008), a case where the same bankruptcy judge did not publish the subject attorney's name.

Unfortunately, during our review of this appeal, we discovered that the Sanctions Opinion has been published. Therefore, we are unable to provide this relief given prior publication.  Further, deleting DeLuca's name from it, presuming we could even order such a remedy, would be ineffective.

-17-

done in a manner consistent with the rules of ethics and professional responsibility binding on all attorneys. Id. In the court's view, DeLuca had not complied with the applicable rules in this case; his boilerplate retainer agreement did not override such mandatory rules. Id.

The court set forth several preliminary findings of fact to support its decision to sanction DeLuca. It found that the issue of Seare's fraud was not overtly discussed during the consultation and that DeLuca never affirmatively represented to Debtors that the St. Rose debt was dischargeable. Id. at 180. It found that DeLuca simply "thumbed through" the district court documents without paying them much heed and that he did not represent either way whether the debt was dischargeable. Id. The court also found that DeLuca did not explain anything about adversary proceedings during the consultation — what they are, whether one was likely in this case, or what the potential consequences would be. Id. at 180-81. DeLuca's cursory review of the district court documents would not have led him to conclude that an adversary proceeding was likely in Debtors' case. Id. at 180. In sum, the court found that DeLuca failed to carefully review the district court documents or inquire about the nature of the Judgment during the consultation, as had he known the debt was for fraud, he would have told Debtors that St. Rose would likely seek to have it found nondischargeable in an adversary proceeding. Id. at 180-81. The court found that DeLuca moved quickly and did not pay sufficient attention to Debtors' individual goals and needs and that his boilerplate forms and standardized approach, which may work for most clients, failed to work for clients like Seare and Tedoco,

-18-

whose circumstances do not fit the mold of the prototypical consumer debtor. Id. at 181.

### 1. DeLuca violated NRPC 1.1.[5]

The bankruptcy court held that DeLuca had violated his duty of competence under NRPC 1.1 by deciding to unbundle adversary proceedings in Debtors' case. In re Seare, 493 B.R. at 192. Specifically, the court found that as a result of a lack of communication at the initial consultation DeLuca failed in his primary duty — ascertaining Debtors' objectives and defining the goals of the representation. Id. at 190.

Debtors' primary goal was to permanently stop the garnishment, and once DeLuca was aware of a garnishment connected to a prior judgment, he, as the bankruptcy expert, had an affirmative duty to investigate. Id. at 190-91. It was not Debtors' burden to reach the legal conclusion that fraud, as defined in the Code, included the fraudulent act Seare committed in the district court. Id. at 190. The court found that DeLuca either did not understand Debtors' primary objective or he negligently assumed the St. Rose debt was dischargeable and thus Debtors' objective would be met. Id. at 191. Either way, he did not exercise the legal knowledge, skill and thoroughness reasonably necessary for the representation. Id. The court found that Debtors could have reasonably anticipated the St. Rose debt would be discharged and that the garnishment would permanently cease. Id. But, they did not likely expect that an adversary

[5] NRPC 1.1 provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

-19-

proceeding would be filed, especially since DeLuca did not explain what an adversary proceeding was or the connection between nondischargeable debts and adversary proceedings. Id. In the court's view, Debtors moved forward and filed a bankruptcy case they might not have otherwise filed had they known it was nearly certain to lead to an adversary proceeding. Alternatively, if given adequate legal counsel, they may have sought an attorney who had a different fee structure concerning adversary proceedings. Id.

The court found that DeLuca, without understanding Debtors' goals for his representation, could not determine which legal services were reasonably necessary to attain those goals or explain to Debtors the challenges they were likely to face in trying to achieve those goals by filing for bankruptcy. Id. In the absence of such guidance, the court found that DeLuca had a duty to offer the services reasonably necessary to achieve permanent cessation of the wage garnishment. Id. at 191-92. Because an adversary proceeding was a near certainty in light of what DeLuca should have known at the time of the initial consultation — that the Judgment was based on fraud — representing Debtors at an adversary proceeding was not only reasonably necessary to achieve their goal of stopping the garnishment, but likely the only way to stop it. Id. at 192. Consequently, DeLuca's decision to unbundle his representation in any adversary proceedings in Debtors' case violated the duty of competence under NRPC 1.1. Id.

///

///

## 2. DeLuca violated NRPC 1.2(c).[6]

The bankruptcy court held that DeLuca violated NRPC 1.2(c) because unbundling the service of adversary proceedings was not reasonable in light of Debtors' circumstances. In re Seare, 493 B.R. at 196. Although the court did not find fault with DeLuca using pre-prepared forms that limit the scope of services included in a flat fee, it did find that deciding to unbundle services reasonably necessary to achieve a client's objectives before even meeting the client was unreasonable and violated NRPC 1.2(c). Id. at 194. Here, it appeared that his decision to unbundle adversary services was made before he ever met Debtors. Alternatively, even if DeLuca's decision to unbundle such services was made during Debtors' initial consultation, that decision was also unreasonable and violated the rule because an adversary proceeding was a near certainty. Id. The court found DeLuca should have known, and would have known had he cursorily investigated the nature of the Judgment, that representing Seare in an adversary proceeding was reasonably necessary to achieve Debtors' reasonably anticipated result — a discharge of the St. Rose debt. Id. at 194-95. Debtors' expectation of a complete discharge was reasonable because DeLuca did not inform them otherwise and they are not bankruptcy experts. Id. at 195.

The court also faulted DeLuca for not communicating his intent not to represent Seare in the adversary proceeding until after the complaint had been filed, knowing that an adversary

---

[6] NRPC 1.2 provides: "A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent."

-21-

proceeding was the only way Seare could possibly discharge the St. Rose debt. Unbundling such service at that point in time was "patently unreasonable" and violated NRPC 1.2(c). Id. at 196.

Lastly, the unbundling was DeLuca's idea, which the court found ran contrary to the ABA's guidance that unbundling should be client-driven. Id.

The bankruptcy court held that DeLuca had further violated NRPC 1.2(c) because he did not obtain Debtors' informed consent in limiting the scope of his representation. Id. at 203. First, the court found that DeLuca did not comply with the rule by adequately communicating the material risks of unbundling adversary proceedings, either in general or in Debtors' case, or the available alternatives to such unbundling. Id. His failure to properly understand their goals and details of their situation — i.e., the nature of the Judgment — rendered adequate communication impossible. Id. at 204. The Retainer Agreement, which the court found to be DeLuca's primary communication with Debtors, did not constitute adequate communication. The Retainer Agreement's "fraud" disclaimer and statements that the flat fee does not include representation for nondischargeability allegations and adversary proceedings, which were in different sections, did not communicate the material risks of proceeding without representation in adversary proceedings, or even that DeLuca may decide not to represent Debtors in an adversary proceeding. Id. Thus, reasoned the court, prospective clients are left to connect the dots — that a debt incurred through fraud is raised in a claim of nondischargeability that is litigated in an adversary proceeding. Id. Hence, without adequate information upon which

-22-

to base a decision, the court found that obtaining Debtors' valid consent was impossible. Id. at 203.

The means of consent here — initialing and signing DeLuca's contract of adhesion — did not sufficiently demonstrate that Debtors understood what services were unbundled, or their particular circumstance, or the seriousness of proceeding without representation in adversary proceedings. Id. at 203-05. Without any explanation to Debtors about the risks of unbundling services, the court found that Debtors could not have known that the bundle of services in the flat fee was unlikely to meet their objectives. Id. at 205. DeLuca neither explained the risks of going it alone in adversary proceedings nor what particular risks Debtors faced, or that they could seek counsel who structured his or her services differently. Id. DeLuca did not communicate the high likelihood of Debtors having to represent themselves pro se or find another attorney, which the court found would have been evident had he reviewed the Judgment. Id. Without DeLuca ever explaining adversary proceedings to Debtors, they could have reasonably agreed to exclude them, assuming that such proceedings were unlikely to occur. However, the court doubted whether Debtors actually made that decision, since DeLuca never explained what an adversary proceeding was. Id.

///
///
///
///
///
///

### 3. DeLuca violated NRPC 1.5.[7]

The bankruptcy court held that DeLuca violated NRPC 1.5(b) because he did not sufficiently explain the scope of services covered under the flat fee and the scope of services available for additional fees, as the rule requires. In re Seare, 493 B.R. at 206. The problem with DeLuca's Retainer Agreement was three-fold. First, the listed services were in legal jargon as opposed to plain English. Id. Seare understood that adversary proceedings were excluded, but did not know what they were. He also knew that "nondischargeability allegations" were excluded, but similarly he might not have known what they were. Id.

Second, Debtors were not aware of the likelihood that they would need to pay for additional services. Id. at 206. Because an adversary proceeding was reasonably foreseeable at the time Debtors agreed to the fee structure and DeLuca did not explain this eventuality to them, the court found that DeLuca improperly unbundled the adversary proceeding from the flat fee. Id. at 206-07. He unfairly placed them in the position of having to bargain for additional legal services in the midst of an adversary proceeding. Id. at 207.

Third, DeLuca violated NRPC 1.5(b) by changing the basis of his fees without advance warning to Debtors. Id. The Retainer Agreement did not state that DeLuca may decide not to represent

---

[7] NRPC 1.5(b) provides: "The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client."

-24-

Debtors in adversary proceedings, only that such services would incur additional fees. The court found that Debtors agreed to pay about $2,000 for an attorney that, for the additional fees, would handle nondischargeability claims and adversary proceedings, and part of the basis for the $2,000 fee was the availability of services if needed. Id. By deciding later not to represent Debtors at all, DeLuca essentially changed the basis of his fees. The court further found that because Debtors did not understand adversary proceedings, the likelihood of one being filed against them, and what it would cost them, they could not have known that the approximately $2,000 they agreed to pay did not include the scope of services reasonably necessary to achieve their goal. Id. Thus, reasoned the court, their choice to pay it could not be considered voluntary. Id.

### 4. DeLuca violated NRPC 1.4.[8]

The bankruptcy court held that DeLuca violated NRPC 1.4 by failing to properly communicate with Debtors. In re Seare, 493 B.R. at 208. Specifically, DeLuca violated NRPC 1.4(a)(2) by failing to reasonably consult Debtors about the means to achieve their objectives. Id. He also violated NRPC 1.4(a)(3) by failing to forward the proposed stipulation and order DeLuca received before St. Rose filed its complaint. Id. Finally, DeLuca

---

[8] NRPC 1.4 provides, in relevant part:

  (a) A lawyer shall:
     . . .
     (2) Reasonably consult with the client about the means by which the client's objectives are to be accomplished;
     (3) Keep the client reasonably informed about the status of the matter;
     (4) Promptly comply with reasonable requests for information[.]

-25-

violated NRPC 1.4(a)(4) by failing to timely respond to Debtors' requests for information. Id. Although the court generally questioned Debtors' credibility, it did find convincing Tedoco's claims about DeLuca's and his staff's failure to return phone calls and to keep them informed of their case. Id. The court also found independently that DeLuca's own records evidenced his office's inattention to detail and poor client communication. He failed to log which paralegal reviewed the retainer agreement with each prospective client, he twice incorrectly filed his OSC briefs in the main case and he failed to serve copies of his OSC briefs on Debtors until after the OSC evidentiary hearing, even though he was ordered to serve them immediately after the initial OSC hearing. Id.

### 5.    DeLuca violated § 707(b)(4)(C).[9]

The bankruptcy court reasoned that, as with DeLuca's ethical violations, his violation of § 707(b)(4)(C) flowed from his failure to investigate the nature of the Judgment. In re Seare, 493 B.R. at 211. The court disagreed that DeLuca performed due diligence in this case, finding that he had taken no steps to

---

[9] Section 707(b)(4)(C) provides:

The signature of an attorney on a petition, pleading, or written motion shall constitute a certification that the attorney has—
(i) performed a reasonable investigation into the circumstances that gave rise to the petition, pleading, or written motion; and
(ii) determined that the petition, pleading, or written motion—
(I) is well grounded in fact; and
(II) is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law and does not constitute an abuse under paragraph (1).

-26-

investigate independently or verify the circumstances underlying the Order of Wage Garnishment, which fell far short of the "reasonable investigation" requirement of § 707(b)(4)(C). Id. at 211-213. Debtors told DeLuca of the circumstances giving rise to the petition — the wage garnishment — and gave him documents from the district court case. Id. at 211. DeLuca demonstrated his awareness of the action by listing it in Debtors' SOFA, including the case name and number. Id. DeLuca's reasonable next step should have been to investigate the Judgment supporting the garnishment, which could have been accomplished by asking questions or reviewing the district court's electronic docket. Id. The fact that the Judgment led to a garnishment was a sufficient "red flag" for further inquiry. Id. at 212. Instead, the court found that DeLuca merely flipped through the documents and assumed that since the debt was owed to a hospital, it must be for medical bills and was thus dischargeable. Id. at 211-12. His office also never obtained any further documents from Debtors, which may have revealed information they failed to provide. Id. at 212. Blaming his clients for that failure was inappropriate because Debtors were not bankruptcy experts. Id.

///
///
///
///
///
///
///
///

### 6. DeLuca violated §§ 526(a)[10] and 528(a).[11]

First, the bankruptcy court found that DeLuca was required to comply with §§ 526 and 528(a) based on his role as a bankruptcy attorney and "debt relief agency," Debtors' role as "assisted persons," and the nature of Debtors' debts. In re Seare, 493 B.R. at 214. Through analysis similar to that utilized in connection with NRPC 1.4, the court found that DeLuca violated § 526(a) by failing to accurately explain that he would not represent Debtors in an adversary proceeding and the risks Debtors could face in bankruptcy. Id. at 215. Although the Retainer Agreement states

---

[10] Section 526(a) provides, in relevant part:

(a) A debt relief agency shall not—

    (1) fail to perform any service that such agency informed an assisted person or prospective assisted person it would provide in connection with a case or proceeding under this title;
. . .
    (3) misrepresent to any assisted person or prospective assisted person, directly or indirectly, affirmatively or by material omission, with respect to—
        (A) the services that such agency will provide to such person; or
        (B) the benefits and risks that may result if such person becomes a debtor in a case under this title.

[11] Section 528(a) provides, in relevant part:

(a) A debt relief agency shall—

    (1) not later than 5 business days after the first date on which such agency provides any bankruptcy assistance services to an assisted person, but prior to such assisted person's petition under this title being filed, execute a written contract with such assisted person that explains clearly and conspicuously—
        (A) the services such agency will provide to such assisted person; and
        (B) the fees or charges for such services, and the terms of payment;
    (2) provide the assisted person with a copy of the fully executed and completed contract.

-28-

that representation for nondischargeability allegations and adversary proceedings would result in additional fees, DeLuca flatly refused to provide these services once the complaint was filed. Thus, he violated § 526(a)(1) by failing to perform a service he informed Debtors he would provide in connection with their bankruptcy case. Id.

The court rejected DeLuca's argument that because Debtors could not afford the additional services anyway, it was immaterial whether or not he was willing to perform them. This argument improperly benefitted from hindsight. Id. The court found that at the time DeLuca refused to perform the additional services, no evidence existed that he ever offered these services to Debtors and that Debtors refused them for lack of funds. Id. DeLuca offered no evidence indicating he consulted at all with Debtors before sending them the June 6 letter of nonrepresentation. Id. At minimum, based on the Retainer Agreement, the court found that DeLuca was obligated to at least quote Seare a price for the adversary representation. Id.

The court found that DeLuca had also violated § 526(a)(3) because he misrepresented, by omission, the risks associated with an adversary proceeding that Debtors were nearly certain to face if they filed for bankruptcy. Id. Because stopping the garnishment was Debtors' primary goal, DeLuca's failure to address the risks of a related adversary proceeding was a material omission. Id.

DeLuca was also found to have violated § 528(a) for the same reasons he had violated NRPC 1.5. Id. While he partially complied with § 528(a)(1) by providing a written contract on the

-29-

same day as the consultation, DeLuca had violated § 528(a)(2) because he failed to provide a "fully executed and completed contract"; he never signed the Retainer Agreement. Id. Further, the court found that DeLuca also violated § 528(a)(1) because the Retainer Agreement did not "clearly and conspicuously" explain the scope of services and fees. Id. Specifically, DeLuca excluded services using technical terms like "nondischargeability allegations" and "adversary proceedings," which a layperson would not likely understand. Further, the standard form contract did not relate these services to a client's particular case, and, without clarification from DeLuca about which additional services were likely to be needed, Debtors had no way of knowing which exclusions were likely to apply and what the chances were of facing increased legal fees. Id. at 215-16.

### b. The sanctions imposed

After carefully reviewing the range of available sanctions, the bankruptcy court ordered the following: (1) that DeLuca disgorge the $1,999 fee paid by Debtors; (2) that the Sanctions Opinion be published to deter such conduct by other attorneys in the future; (3) that DeLuca complete some Continuing Legal Education credits; and (4) that for the next two years DeLuca provide a copy of the Sanctions Opinion to every client who is sued in an adversary proceeding, but only if DeLuca declines to represent them in that adversary proceeding for any reason. Id. at 224-27. The court declined to impose any further monetary sanctions beyond disgorgement, despite the authority to do so, because of DeLuca's good standing and his efforts to mitigate the situation by offering to refund the fee and represent Seare in

-30-

negotiations with St. Rose. Id. at 226. DeLuca timely appealed.

### 5. The result of adversary proceeding

On January 2, 2013, St. Rose filed a Confession of Judgment, in which Seare authorized a nondischargeable judgment against him for $67,430.58.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

Did the bankruptcy court abuse its discretion in sanctioning DeLuca and imposing the types of sanctions that it did?

## IV. STANDARDS OF REVIEW

"We review all aspects of an award of sanctions for an abuse of discretion." Orton v. Hoffman (In re Kayne), 453 B.R. 372, 380 (9th Cir. BAP 2011) (citing Price v. Lehtinen (In re Lehtinen), 332 B.R. 404, 411 (9th Cir. BAP 2005), aff'd, 564 F.3d 1052 (9th Cir. 2009)); In re Nguyen, 447 B.R. 268, 276 (9th Cir. BAP 2011) (en banc)). The bankruptcy court's choices of sanctions are also reviewed for abuse of discretion. U.S. Dist. Ct. for E.D. Wash. v. Sandlin, 12 F.3d 861, 865 (9th Cir. 1993). A bankruptcy court abuses its discretion if it applies the wrong legal standard or its factual findings are illogical, implausible or without support in the record. TrafficSchool.com v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011).

With respect to sanctions, a bankruptcy court's factual findings are reviewed for clear error and given great deference. Primus Auto. Fin. Servs., Inc. v. Batarse, 115 F.3d 644, 649 (9th Cir. 1997). A factual finding is clearly erroneous if it is

-31-

illogical, implausible or without support in the record.  <u>Retz v. Samson (In re Retz)</u>, 606 F.3d 1189, 1196 (9th Cir. 2010).

Whether an appellant's due process rights were violated is a question of law we review de novo.  <u>Miller v. Cardinale (In re DeVille)</u>, 280 B.R. 483, 492 (9th Cir. BAP 2002), <u>aff'd</u>, 361 F.3d 539 (9th Cir. 2004).

**V. DISCUSSION**

**A.   The bankruptcy court's power to sanction attorneys**

"Bankruptcy courts have the inherent authority to regulate the practice of attorneys who appear before them."  <u>In re Nguyen</u>, 447 B.R. at 280 (citing <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 43-45 (1991); <u>Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.)</u>, 77 F.3d 278, 284-85 (9th Cir. 1996)).  "Bankruptcy courts also have express authority under the Code and the Rules to sanction attorneys, including disbarment or suspension from practice."  <u>Id.</u> at 281 (citing <u>In re Lehtinen</u>, 564 F.3d at 1058, 1062; § 105(a)).  "The bankruptcy court has wide discretion in determining the amount of a sanctions award."  <u>In re Kayne</u>, 453 B.R. at 386 (internal quotation marks and citation omitted).  The Local Rules for the District Court of the District of Nevada also grant considerable leeway in fashioning sanctions for violations of the NRPC.  Local Rule IA 10-7(a) provides that "[a]ny attorney who violates these standards of conduct may be disbarred, suspended from practice before this Court for a definitive time, reprimanded or subjected to such other discipline

as the court deems proper."[12]

In reviewing attorney disciplinary sanctions, we determine whether (1) the disciplinary proceeding was fair, (2) the evidence supports the findings, and (3) the penalty imposed was reasonable. In re Nguyen, 447 B.R. at 276.

## B. The bankruptcy court did not abuse its discretion when it sanctioned DeLuca and imposed the sanctions that it did.

DeLuca raises several arguments on appeal, most of which pertain to the bankruptcy court's findings of fact or his dispute with some of the sanctions imposed. We address each of his arguments in turn.

We begin with the bankruptcy court's consideration of Tedoco's late-filed brief after the matter had been taken under submission. The court stated at the OSC evidentiary hearing that once the transcripts from the two OSC hearings were recorded on the docket, the matter would stand submitted. The transcripts were recorded on October 30, 2012. Presumably, evidence closed on that date. Tedoco's brief was filed on December 4, 2012. Citing to no authority, DeLuca argues that the bankruptcy court committed reversible error by considering Tedoco's late-filed brief and relying on the inadmissible facts contained therein for much of its decision.

Reopening of a case after the close of evidence rests in the discretion of the trial court. Mo. Pac. Ry. Co. v. Oleson, 213 F. 329, 331-32 (8th Cir. 1914); United States v. Hugh, 236 F. App'x

[12] Part IA of the Local Rules of Practice for the U.S. District Court for the District of Nevada apply in all bankruptcy cases and proceedings in the U.S. Bankruptcy Court for the District of Nevada. See Local Rule IA 2-1.

-33-

796, 802 (3d Cir. June 14, 2007) (Ambro, J., dissenting) ("there is no iron-bound, copper-fastened, double-riveted rule against the admission of evidence after both parties have rested upon their proof") (quoting United States v. Blankenship, 775 F.2d 735, 741 (6th Cir. 1985) and citing Oleson). Therefore, it was within the bankruptcy court's discretion to consider Tedoco's late-filed brief.

However, we agree with DeLuca that Tedoco's brief consisted only of argument, not admissible evidence. As such, the bankruptcy court erred in considering it. United States v. Moreland, 622 F.3d 1147, 1162 (9th Cir. 2010) (argument is not evidence); Hurley v. Student Loan Acquisition Auth. of Ariz. (In re Hurley), 258 B.R. 15, 23 (Bankr. D. Mont. 2001). Nonetheless, much of what Tedoco asserted had already been established by Seare, either by his testimony at the OSC evidentiary hearing or in documentary evidence the parties submitted. Therefore, it was harmless error for the bankruptcy court to consider any facts asserted in the brief because they were already before the court through competent evidence. Lillie v. United States, 953 F.2d 1188, 1192 (10th Cir. 1992) (admission of improper evidence of a fact in issue is harmless when the judgment is supported by sufficient competent evidence). The few facts the court should not have considered, however, as we discuss more fully below, are insufficient to establish reversible error.

**1.   DeLuca's arguments regarding the violations of the NRPC**

        **a.   NRPC 1.1 and NRPC 1.2**

DeLuca first takes issue with the bankruptcy court's findings under NRPC 1.1 that his unbundling of adversary proceedings was

-34-

unreasonable in this case because it failed to achieve Debtors' reasonably anticipated result — i.e., discharge of the St. Rose debt. DeLuca contends that three problems exist with this finding: (1) it assumes the debt was dischargeable; (2) the bankruptcy court made comments during the initial OSC hearing with Seare present that led Seare to testify at the evidentiary hearing that dischargeability and adversary proceedings were not explained to him by DeLuca; and (3) it fails to recognize that because St. Rose did not include Tedoco in the adversary proceeding and she received a discharge, the debt is uncollectible against Seare under the community discharge, so DeLuca did in fact achieve Debtors' reasonably anticipated result.

Any bankruptcy professional would recognize the obstacles a debtor faces in trying to achieve the discharge of a debt based on fraud. However, the bankruptcy court found that Debtors could have reasonably anticipated the St. Rose debt would be discharged and that the garnishment would permanently cease, based on DeLuca's failure to investigate the Judgment and inform his clients of the inevitable adversary proceeding. It further found it impossible for DeLuca to provide adequate counsel as a result of his erroneous assumption that the Judgment arose from unpaid medical bills. We see no clear error in that finding.

As for comments made by the bankruptcy court at the initial OSC hearing, it is true that Seare testified at the later evidentiary hearing that he did not know what adversary proceedings were and that DeLuca never discussed them. However, this was not the only evidence showing that DeLuca failed to explain the meaning of dischargeable versus nondischargeable

-35-

debts, the meaning of adversary proceedings or the connection between them. It was reasonable for the court to infer that this discussion never occurred with Debtors because, by DeLuca's own admission, he was not aware that the Judgment was based on fraud. Also, Seare testified that the issue of fraud never came up at the consultation. If it had, one would expect DeLuca to have explained nondischargeable debts and adversary proceedings. More importantly, DeLuca never affirmatively testified that he <u>did</u> explain these matters to Debtors and no record exists that any member of DeLuca's staff did either. Although it was his office's protocol to have a staff member go through every page of his retainer agreement with clients, DeLuca could not establish that it occurred in this case. Tedoco claimed that no one went through the Retainer Agreement with Debtors, but this was an inadmissible fact the bankruptcy court should not have considered.

As for his third argument that the St. Rose debt is uncollectible due to the community discharge, DeLuca admits he did not raise this issue before the bankruptcy court. As such, we are not required to consider it for the first time on appeal. <u>O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.)</u>, 887 F.2d 955, 957 (9th Cir. 1989); <u>Concrete Equip. Co. v. Fox (In re Vigil Bros. Constr., Inc.)</u>, 193 B.R. 513, 520 (9th Cir. BAP 1996). In any event, when considering whether the community discharge under § 524(a)(3) applies, the bankruptcy court must first determine whether the debt is a community debt under state law. The court must then determine the scope of the discharge. <u>Arcadia Farms Ltd. v. Rollinson (In re Rollinson)</u>, 322 B.R. 879, 881 (Bankr. D. Ariz. 2005) ("Once a debt has been determined to be a community

-36-

debt pursuant to state law, the second issue is the scope of the discharge."). Neither of those determinations have been made here. Further, "when the debtor has incurred a nondischargeable debt or is not entitled to a discharge, or the debtor's spouse would have been denied a discharge or had a debt declared nondischargeable in a hypothetical bankruptcy case commenced on the same day as that of the debtor, the nondischargeable debt of either spouse will survive against after-acquired community property." 4 COLLIER ON BANKRUPTCY ¶ 524.02[3][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013). Therefore, Debtor was not entitled to a community discharge of a debt he could not himself discharge. Even if DeLuca's argument has merit, which we do not believe it does, we find it improper that he rely on subsequent events beyond his control to try to negate his prior shortcomings in complying with the rules of ethics.

DeLuca next takes issue with the bankruptcy court's finding that he failed to obtain Debtors' informed consent to unbundle adversary proceedings. DeLuca rests his arguments on the disclosures in the Retainer Agreement and FAQ about the nondischargeability of fraud debts and Seare's admission that he did not read the FAQ. DeLuca contends the court erred in finding that Seare did not give informed consent, after Seare had admitted he made no effort to read any of the documents he signed and failed to ask any questions. In other words, argues DeLuca, a client cannot argue that disclosures are insufficient and consent invalid when he makes no effort to read, review and question critical documents. The bankruptcy court considered and rejected this argument. It found that the Retainer Agreement's "fraud"

-37-

disclaimer and its disconnected "legal jargon" statements about what was or was not included in the flat fee left prospective clients to "connect the dots" that a debt incurred through fraud is raised in a claim of nondischargeability, which is litigated in an adversary proceeding, and that it was something that requires additional fees for representation. The court also found it improper for DeLuca to put the onus on layperson debtors to make these conclusions. We see no clear error here.

DeLuca also quibbles with the bankruptcy court's characterization of Debtors' goal as one to "permanently" stop the wage garnishment, when Seare testified that his desire was "to get the wage garnishment stopped." DeLuca argues that the court added the word "permanently," which it inferred from Tedoco's late-filed brief — a brief it should not have considered. Although Tedoco used the word "permanently" in her brief, Seare also testified at the evidentiary hearing that the sole reason for filing bankruptcy was to "get rid of" the garnishment and that the temporary cessation of it was not the benefit they were seeking. Further, DeLuca's argument defies logic. Of course Debtors wanted the garnishment to disappear forever, not just for a few months.

DeLuca alternatively argues that even if Debtors' goal was permanent cessation of the garnishment, the garnishment was stopped as of the date of the OSC evidentiary hearing, so DeLuca did fulfill his duty of competence by achieving the goal of "stopping the garnishment." For the reasons already discussed and given by the bankruptcy court, we need not address this meritless argument.

Lastly, DeLuca argues that the bankruptcy court "improperly

put itself in Debtors' place" and went outside the record when it found that Debtors may have chosen not to file bankruptcy or may have sought an attorney with a different fee structure, had they known about the dischargeability concerns related to the St. Rose debt. We disagree. This inference was reasonable for the court to make in light of this record. Plus, this fact alone does not change the conclusion that DeLuca violated his duty of competence. Despite DeLuca's contentions, whether the St. Rose debt was actually dischargeable is not the point. The point is: What is the nature of the debt; what relief may the creditor seek against Debtors; and what will Debtors need to do to defend against the claim? Debtors needed DeLuca to inform them sufficiently of the risks associated with the St. Rose debt before they could properly provide informed consent to allow DeLuca to unbundle services. DeLuca failed to advise them about the debt or its risks because he did not perform even a minimal investigation, which would have revealed that the Judgment arose from fraud. Without that knowledge, it was impossible for DeLuca to determine Debtors' circumstances and advise them as to what sort of representation would be needed to achieve their goal of eliminating the St. Rose debt and the garnishment.

We conclude the bankruptcy court did not err in determining DeLuca violated NRPC 1.1 and 1.2(c).

### b. NRPC 1.4 and NRPC 1.5

DeLuca next argues that the bankruptcy court erred in determining he violated NRPC 1.5 because he did not sufficiently explain the scope of services covered under the flat fee and the scope of services available for additional fees. DeLuca points to

-39-

Seare's testimony that he understood DeLuca would not be representing him in any allegations of fraud. Again, DeLuca misses the point. Seare may have understood that defending fraud allegations would require an additional fee or that adversary proceedings or nondischargeability allegations were excluded from the flat fee, but the Retainer Agreement — the only communication to Debtors explaining the scope of DeLuca's services and/or for what fees — failed to make the connection between these issues. Accordingly, we perceive no error with the bankruptcy court's decision that DeLuca violated NRPC 1.5.

Finally, DeLuca contends the bankruptcy court erred in determining that he violated NRPC 1.4 by failing to properly communicate with Debtors. DeLuca first asserts a due process concern over whether he received sufficient notice that the bankruptcy court was considering sanctioning him under this rule. DeLuca correctly notes that any potential violations of NRPC 1.4 were not raised in the OSC, or in the order setting the evidentiary hearing, or at either hearing. Therefore, he argues that sanctioning him under this rule violated his due process rights and should be reversed. "When an attorney is subject to discipline, he or she has a right to notice and an opportunity to be heard." In re Nguyen, 447 B.R. at 278 (citing In re Ruffalo, 390 U.S. 544, 551-52 (1968); In re Lehtinen, 564 F.3d at 1060)). To satisfy the requirements of due process in this context, "the attorney must receive prior notice of the 'the particular alleged misconduct and of the particular disciplinary authority under which the court is planning to proceed' along with an opportunity to respond." Id. (quoting In re DeVille, 361 F.3d at 548). The

-40-

rule, however, is not absolute. In re Deville, 361 F.3d at 548.

Here, the OSC notified DeLuca of his alleged misconduct and that the bankruptcy court was considering disciplining him under NRPC 1.1, 1.2 and 1.5. Absent from this is any reference to NRPC 1.4. Despite the court's omission of NRPC 1.4 in the OSC or in the order setting the evidentiary hearing, we conclude that DeLuca was not deprived of due process. DeLuca had notice of the conduct potentially subjecting him to discipline under several provisions of the NRPC and under sections of the bankruptcy code, which interrelatedly address similar, if not, identical requirements imposed under the general rubric of professional conduct. If the attorney has been sufficiently informed of the alleged misconduct, the Ninth Circuit has upheld sanctions even when a bankruptcy court, in advance of a disciplinary proceeding, stated that Rule 9011 was the basis for discipline, yet it proceeded to impose sanctions under its inherent authority. See In re DeVille, 361 F.3d at 550. Even if the court improperly considered NRPC 1.4, it committed harmless error as the elements of this rule are also generally included in the provisions that were identified by the court in its orders, i.e., NRPC 1.4, § 526(a) and § 528(a) involve what services and means are necessary to accomplish the client's objectives. The bankruptcy court informed DeLuca through orders and at the hearings of the conduct that would be the subject of any discipline.

Nonetheless, we must address a second issue. Many of the facts asserted in Tedoco's brief were used extensively in the bankruptcy court's decision to find that DeLuca had violated NRPC 1.4. Again, these "facts" should not have been considered.

However, other admissible facts in the record support the court's decision to find that DeLuca violated NRPC 1.4, namely, DeLuca's failure to inform Debtors of the St. Rose fax containing the proposed stipulation and order about the Judgment.  Also in evidence was Debtors' email to DeLuca's office that his failure to return phone calls was unacceptable and unprofessional customer service.  Finally, the court found independently that DeLuca's own records indicated his office's inattention to detail and poor client communication.  He fails to log which paralegal reviewed the retainer agreement with each prospective client.  As such, we see no error in the bankruptcy court's decision that DeLuca violated NRPC 1.4.

## 2. DeLuca's arguments regarding the violations of §§ 707(b)(4)(C), 526(a)(1) and (3), and 528(a)(1) and (2)

DeLuca also raises a due process concern with respect to the bankruptcy court's decision to sanction him under these various sections of the Code.  DeLuca contends that the court only "orally" added §§ 707(b)(4) and 526(a), both of which have four subparts each, at the initial OSC hearing and failed to specify which subpart(s) DeLuca potentially violated.  Thus, because he was not provided adequate written notice of these alleged violations, nor the potential sanctions associated with them, DeLuca contends they should all be stricken.  While it is true that the court orally added these Code sections at the initial OSC hearing out of concern for some of DeLuca's answers, this was not the only notice DeLuca received about them.

In the order entered on September 20, 2012, and setting the evidentiary hearing, the bankruptcy court specifically set forth

-42-

which subpart(s) of each section were at issue, citing them right in the order. Notably, DeLuca failed to include this order in his excerpts of record. Given his failure to include the order, DeLuca's contention on appeal that he did not receive written notice of the Code sections at issue is sanctionable.

DeLuca asserts that even if we conclude he received adequate notice, he nonetheless complied with each section. As for § 707(b)(4)(C), DeLuca argues that the "reasonable investigation" requirement goes more to the omission of assets or debts, not whether a debt is dischargeable. While it is true that much of the case law on this issue has concerned an attorney's omission of assets in bankruptcy schedules, DeLuca has not cited any authority establishing that this section could not be applied in the way the bankruptcy court did here. Bottom line, DeLuca did not perform a "reasonable investigation into the circumstances that gave rise to the petition." § 707(b)(4)(C). Accordingly, we see no error.

DeLuca also contends that he complied with § 526(a)(1) and (3). Although his argument is somewhat unclear, DeLuca apparently argues that he did not violate § 526(a)(1) because the Retainer Agreement stated only that he would not represent Debtors in an adversary proceeding without additional fees, not that he would not represent them in one at all, as the bankruptcy court found. DeLuca says he decided to not represent Debtors after the full scope of Seare's actions became known. First, the bankruptcy court did not find that the Retainer Agreement said DeLuca would never represent Debtors in an adversary proceeding. In fact, it found just the opposite, which led to DeLuca's problem. The Retainer Agreement stated that representation for

-43-

nondischargeability allegations and adversary proceedings was available for an additional fee, but DeLuca flatly refused to provide these services once the complaint was filed. Hence, the court found he violated § 526(a)(1) for his failure to perform a service he informed Debtors that he would provide in connection with their bankruptcy case.

As for § 526(a)(3), DeLuca contends that because the St. Rose complaint did not include Tedoco and she received a community discharge, and thus the debt is ultimately uncollectible against Seare, the bankruptcy court erred in determining that he violated § 526(a)(3). For the same reasons stated above, we reject this argument. In any event, the record supports the bankruptcy court's decision. DeLuca failed to comply with § 526(a)(3) because he did not inform Debtors about the risks associated with an adversary proceeding they were nearly certain to face once they filed for bankruptcy.

Lastly, DeLuca contends that he received even less due process regarding any violations of § 528 because it was never mentioned prior to the bankruptcy court's decision. We agree that § 528 was not mentioned anywhere prior to the entry of the court's Sanctions Opinion. However, as a bankruptcy attorney, DeLuca knew he had not signed the Retainer Agreement as required by § 528. Further, as noted by the bankruptcy court, DeLuca satisfied the qualifying factors imposed by § 528 and was required by statute to comply with its requirements. As § 528 mandates compliance, we find no error.

**3. DeLuca's arguments about the sanctions imposed**

DeLuca argues that the sanctions imposed upon him were too

-44-

severe. Specifically, he argues that the bankruptcy court impermissibly went far beyond the list in its OSC of potential sanctions DeLuca faced. The orders specifically provided that monetary and nonmonetary sanctions may be considered and imposed. Keeping in mind that bankruptcy judges have broad discretion in determining the type of sanctions to impose, the court imposed sanctions encompassed within the general designation of monetary and nonmonetary sanctions expressly stated in the OSC. The court did not impermissibly exceed the described sanctions. We further conclude that the sanctions were fair, supported by the evidence and reasonable. See In re Nguyen, 447 B.R. at 276.

DeLuca argues that ordering him to provide a copy of the Sanctions Opinion to potential adversary clients whose case he declines for the next two years is excessive and violates his commercial free speech. Leaving aside momentarily the "excessive" argument, DeLuca has not cited a case holding that ordering a sanctioned attorney to provide prospective clients with the court's decision sanctioning the attorney violates his or her free speech. In any event, this sanction was of particular importance to the bankruptcy court as a means to protect future debtors by ensuring they are properly informed of the risks of unbundling, and to promote a systematic change in DeLuca's practice, which the court characterized as a "mill" practice. The court also saw this sanction as a means of informing the bar that being disciplined for unethical conduct has repercussions beyond just paying a fine and moving on. We find it difficult to disagree with this reasoning. Accordingly, we do not conclude that this sanction was excessive.

-45-

Lastly, DeLuca argues that he should not have to disgorge his fee, particularly the filing fee and credit report fee, because Debtors did obtain the benefit of a discharge, and Seare's credit score increased by over 100 points following the discharge. As for the actual fee paid to DeLuca, we cannot say the bankruptcy court abused its discretion under the circumstances. In fact, it did not, despite the authority to do so, order any additional monetary sanctions because of DeLuca's efforts to return his fee to Debtors and to represent Seare in settlement negotiations with St. Rose. Given the record, we conclude the bankruptcy court did not abuse its discretion in including the filing and credit report fees within the total amount to be disgorged, especially when prior to the issuance of the Sanctions Opinion, DeLuca agreed to return Debtors' money.[13]

## VI. CONCLUSION

Consumer bankruptcy attorneys can unbundle their services in Nevada, particularly, adversary proceedings. However, unbundling, or limited scope representation, needs to comply with the rules of ethics and the Bankruptcy Code. A qualitative analysis of each individual debtor's case must be done at intake to ensure that his or her reasonable goals and needs are being met. That calculus

---

[13] DeLuca also argues that the bankruptcy court erred in refusing to allow him to disclose the terms of the settlement offer between St. Rose and Seare that he helped procure, before it imposed sanctions. Actually, the "cat is already out of the bag" since DeLuca mentioned it on the record at the OSC evidentiary hearing, and the transcript is on the docket for the world to see. Certainly, the bankruptcy court was aware of it at the time it entered the Sanctions Opinion. In any event, we fail to see how allowing this into the record would have made any significant difference in the sanctions the court imposed. Actually, DeLuca's offer to help Seare procure a settlement with St. Rose appears to have helped him.

-46-

was not applied in this case.  For the foregoing reasons, we AFFIRM.

Concurrence begins on next page.

JURY, Bankruptcy Judge, Concurring:

I write separately to highlight what this disposition, and the lengthy published opinion of the bankruptcy court in In re Seare, 493 B.R. 158, hold and what they do not hold. Importantly, they do not hold that unbundling representation of a debtor in a nondischargeability adversary proceeding from general representation of that debtor in a bankruptcy case is prohibited. What they do say is that an attorney who wishes to limit her or his scope of bankruptcy representation should be mindful of the ethical minefield he or she must navigate.

I agree with the majority that the bankruptcy judge here did not abuse his discretion in concluding that DeLuca violated numerous sections of the Nevada Rules of Professional Conduct (NRPC) and also failed to comply with certain requirements of the Bankruptcy Code when he unbundled representation of Seare in the St. Rose adversary. The factual findings amply support the conclusion that Deluca stumbled in that ethical minefield. However, unbundling representation of a consumer debtor in an adversary proceeding is neither prohibited by state ethical standards nor by the Bankruptcy Code. If done correctly, unbundling may be key to competent consumer bankruptcy attorneys providing much needed representation to debtors at an affordable price. Without the ability to unbundle adversaries, the flat fee which a consumer attorney would need to charge for basic bankruptcy representation might become prohibitive and exacerbate the already existing problem of pro se filings.

To be sure, the bankruptcy judge here did not suggest that

-1-

unbundling was never appropriate. Indeed, in his opinion he describes the background and general acceptance of limited scope representation by the American Bar Association (ABA), which has provided for limited scope in its Model Rules, the American Bankruptcy Institute (ABI), and by most states in their ethical rules which monitor the performance of lawyers. Seare, 493 B.R. at 183. Despite recognizing this broad acceptance, however, the bankruptcy judge found that DeLuca fell woefully short of complying with the ethical standards which surround unbundling and therefore sanctioned him for this shortcoming. The judge found that unbundling the adversary proceeding in the representation of Seare based on the unique facts of this case was not possible to achieve the reasonably anticipated result of the client. Therefore, I believe it is useful to focus on why this unbundling failed and how a consumer bankruptcy lawyer might avoid the pitfalls which brought down DeLuca.

As highlighted by the bankruptcy judge, both the NRPC and the ABA Model Rules state that an attorney may "limit the scope of representation if the limitation is reasonable under the circumstances and the client gives informed consent." NRPC 1.2(c); ABA Model Rule 1.2. It was the implementation of this rule from the initial intake interview that tripped DeLuca up because he did not properly define the goal of the representation of Seare: to permanently stop the garnishment on the St. Rose judgment. The failure to recognize this goal was caused by the circumstances described by the bankruptcy judge and the majority and need not be repeated here. In a nutshell, the communication between Seare and DeLuca did not cause DeLuca to recognize that

-2-

the St. Rose judgment was likely nondischargeable as based on fraud[14]; therefore, his representation would not stop the garnishment *permanently* unless he defended and won or settled the adversary proceeding. By not making the necessary reasonable inquiry about the judgment, DeLuca's attempt to unbundle did not achieve the goal of limited scope: to provide a bundle of services reasonably necessary to achieve the client's reasonably anticipated result. In re Seare, 493 B.R. at 188.

All the other ethical and statutory violations found by the bankruptcy judge flowed from this initial deficiency in the limited scope representation. DeLuca failed to perform competently because he did not identify the goal and provide services to accomplish the goal - i.e. representing Seare in the adversary proceeding, causing the violation of NRPC 1.1. The unbundled services he promised for the agreed flat fee was not a reasonable limited scope, causing the NRPC 1.2 error. He did not obtain informed consent because he relied on a boilerplate Retainer Agreement with legal jargon which, although it described fraud as nondischargeable and that representation in an adversary was not included in the flat fee, did not connect the dots such that Seare was made aware of the risk of accepting such limited scope representation and why it would not achieve his desired result, being free of the St. Rose garnishment. Just Seare initialing every page of the Retainer Agreement did not provide the particularized communication necessary for informed consent.

---

[14] It is ironic to me that although every reference to this judgment as being nondischargeable talks about fraud, the grounds under which St. Rose sought nondischargeability were §§ 523(a)(4) and (6), not fraud.

-3-

The other violations of the NRPC are similarly tied to failure to identify the goal and provide the services necessary to achieve it.

The Bankruptcy Code violations are founded on the same deficiencies: DeLuca's failure to investigate the St. Rose judgment to determine its nondischargeable nature caused the § 707(b)(4)(c) violation; the failure to get informed consent regarding nonrepresentation in the adversary resulted in the § 526(a)(1) violation (when DeLuca refused to represent Seare at all in the adversary, even for a further fee); and DeLuca violated § 526(a)(3) when he did not fully explain the limitation on the services which the flat fee would buy.[15]

The bankruptcy judge chose to publish his opinion as part of the sanctions of DeLuca "to deter such conduct by all attorneys."[16] I summarize here my suggestions for such attorneys to avoid violating ethical rules and the Bankruptcy Code when they limit the scope of representation of consumer debtors:

1. At the initial intake interview with the debtor, identify fully and completely the debtor's goals. Almost by definition, the attorney therefore cannot have a predetermined business practice that excepts representation in adversary proceedings from the services the attorney will render unless the attorney and

---

[15] The violation of § 528 is based on the failure of DeLuca to sign the Retainer Agreement and is not related to the unbundling issue.

[16] In joining the majority, I also endorse their view that the bankruptcy judge followed the proper procedures and had the authority to impose the sanctions ordered, in accordance with In re Nguyen, 447 B.R. 268 (9th Cir. BAP 2011) (en banc).

-4-

debtor identify that exception before deciding to commence representation. As noted by the bankruptcy judge, the decision to unbundle must be driven by the debtor's needs, not the attorneys.

2. The attorney may not rely solely on the debtor's input to help him or her ascertain the debtor's goal. Both the ethical rules and the Code require the attorney to conduct a reasonable investigation of the debtor's assets and liabilities. If the attorney learns that a judgment has been taken against the debtor, the attorney must make reasonable inquiry into the nature of the judgment in order to determine whether it might be subject to nondischargeability.

3. If, after ascertaining the debtor's goals, the attorney believes that limited scope representation is consistent with those goals, the attorney must then fully explain to the debtor the consequences and inherent risks which might arise if an adversary is filed against the debtor and the attorney has not included representation in that proceeding in the unbundled services. Informed consent is just that: informed. The debtor must understand the "legal jargon" and the practical effect on him or her of the limited scope representation before the consent is informed.

4. The attorney must customize the retainer agreement to the goals of debtor. That is not to say that much of the agreement cannot be boilerplate, but boilerplate without the attorney's active role in its preparation will be insufficient for limited scope representation. Just having the debtor read and initial the agreement does not assure the debtor is giving informed consent.

5. After describing to the debtor the risks of limited scope

-5-

representation, the attorney must give the debtor the opportunity to "shop elsewhere" for an attorney who will provide full representation before entering into the contractual relationship with the debtor for the limited scope.

6. The attorney should document as fully as possible all the steps taken to comply with these requirements.

Following these suggestions should go a long way to allowing consumer bankruptcy attorneys to unbundle adversary proceeding representation without violating ethical rules.